JAN 3 1 2013

12-1508

UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

GLENN BOGUE

Petitioner-Appellant

V.

COMMISSIONER OF INTERNAL REVENUE

Respondent-Appellee

ON APPEAL FROM DECISION OF THE UNITED STATES TAX COURT

Case # 12291-09      T.C. Mem  2011 - 164

BRIEF OF APPELLANT GLENN BOGUE

GLENN BOGUE, PRO SE

24 WATERCLIFFE RD

TORONTO, ONTARIO  M9W 4E7

TABLE OF CONTENTS

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD............................2

JURISDICTIONAL STATEMENT ......................................................... .........2

STATEMENT OF THE MAIN ISSUES............................................................3

AUTHORITIES.........................................................................................................4

STATEMENT OF FACTS ...............................................................................5

    The Litigation History ...................................................................5


ARGUMENT.................................................................................................6

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to Federal Rule of Appellate Procedure 34(a), Petitioner/Appellant respectfully requests oral argument.

I believe that oral argument will assist the Court in deciding this appeal, which involves a number of important national legal issues, TO WIT:

1) The constitutional issues surrounding the massive judicial confusion that exists throughout all

    the Federal Circuits regarding the force and effect of the 16th Amendment;

2) To propound the correct statement of law regarding deductions for mileage driven from home

    to various jobsites for all construction workers in America.

Oral argument will enable the parties to address these issues adequately and respond to the Court's questions and concerns.

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of the United States District Court for Third Circuit, entered on July 11, 2011.

Notice of appeal was timely filed. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

STATEMENT OF THE MAIN ISSUES

This Appeal may be divided into two parts:

(1) The Constitutional issue that affects every single person living on American soil, to wit:

Did the 16th Amendment merely add property as a basis for Excise taxation on corporate

activity as affirmed by THE SUPREME COURT in both Brushaber and Stanton decisions?

Or

Did the 16th Amendment remove the regulation of "without apportionment" that was

preventing the Congress from directly taxing private property (income from an inalienable

right), as held by some lower courts but declared "destructive" and "erroneous" by The

Supreme Court?

(2) If the latter, then:

   (a)   did the Trial Court err in permitting the Appellee to mis-state the law on mileage

         deductions from Appellant's  home to temporary jobsites, thereby creating an

         unfair trial?

   (b)   did the Trial Court err in not considering Ex 17 - J and 18 -J as proof that Appellant

         had "another regular work  location" as condition precedent to deducting miles

         from home to a temporary jobsite?

   (c)   Should this Appellate Court issue a clear rule, combining caselaw and confusing IRS

         regulations,  into ONE clear statement for all independent construction contractors

         to follow?

3

## AUTHORITIES

### Constitutional Issue

Bowers v. Kerbaugh-Empire Co. 271 U.S. 170 (1926)

Brushaber vs Union Pacific R.R. Co 240 U.S. 1 at 10-11 (1916)

Eisner vs Macomber 252 U.S. 189 at 205 (1920)

Graham v. Richardson, 403 U.S. 365, 371 (1971)

Peck & Co. v. Lowe 247 U.S. 165, 172 (1918)

Stanton vs Baltic Mining Co. 240 US 103, at 112 (1916)

Stratton's Independence v. Howbert 231 U.S. 399 (1913)

Numerous cases listed in Appendix A

### Mileage Deductions

Commissioner v  Flowers  326 US 465 (1946)

Fausner v Commissioner, 413 US 838 (1973)

Feistman v Commissioner, 63 T.C. 129, 134 (1974)

Steinhort v. Commissioner  335 F 2d 496

Walker v Commissioner 101 T.C. 537, 546 (1993)

### Book Writing Deductions

A. Finfenberg v Commissioner 17 T.C. 973, 982-983 (1951)

Gestrich v Commissioner, 74 T.C. 525 (1980)

### Presumption of Correctness

United States v. Rindskopf, 105 U. S. 418; Fidelity & Columbia Trust Co. v. Lucas, 7 F.2d 146, 7

4

## STATEMENT OF FACTS

1.  Petitioner/Appellant was a Builder and Author who timely filed Income Tax Returns for
    calendar 2005 and 2006.

2.  Respondent/Appellee is the Commissioner whose field audit alleged various deficiencies for
    each year, based exclusively on Appellant's deductions as opposed to failure to report
    "income."

## LEGISLATIVE HISTORY

1.  Petitioner/Appellant applied to the District Tax Court for a hearing. The opinion of that court is
    the subject of this appeal, along with the constitutionality of the substance underlying the
    alleged "income" tax that is the main basis of the appeal.

ARGUMENTS

(note: Caps added for emphasis)

ISSUE #1 CONSTUTIONAL ISSUE:

DID THE 16TH AMENDMENT CREATE A NEW TAXING POWER BY CONGRESS OVER INCOME

FROM PRIVATE PROPERTY THAT WAS PREVIOUSLY PROTECTED BY THE U.S. CONSTITUTION?

OR

DID THE 16TH AMENDMENT REINFORCE AN EXISTING POWER TO TAX INCOME FROM

CORPORATE PRIVILEGE, AS PROFITS IN THE HANDS OF EITHER CORPORATIONS OR INDIVIDUALS

1.The Appellant is a Resident Alien who is nonetheless afforded the 'due process of law' of the 14th

Amendment of the U.S. Constitution.

( Graham v. Richardson, 403 U.S. 365, 371 (1971)

2.The Supreme Court has power to interpret the U.S. Constitution, and to regulate the lower courts at every level per Article III of the U.S. Constitution.

Its jurisdiction is set out by statute in Title 28 of the U.S. Code. The Court itself promulgates the rules

governing the presentation of cases to it.

See Supreme Court Rules (effective Oct. 2, 1995).

3.The core issue raised herein directly addresses money (fruit of one's labor) and the power of the government to take it, but the issue indirectly impacts  each person's ability to create jobs for others around them (e.g the construction industry and deduction of miles driven raised in later issues below).

On a much larger scale, the Constitutional issue of taxing power and the REGULATION thereof affects the entire American nation, and is in fact the core reason for its Revolution against the throne of England.

4.  Recently, various federal courts have been presented with arguments that have been lumped into "Frivolous Tax Arguments."  Few of the Petitioners or Appellants were represented by counsel in these types of cases, and so the correctly framed legal examination, including the history leading up to the rationale and passage of the 16th Amendment, has hitherto not been placed before more recent appellate courts.

There are only TWO powers of taxation possible under the U. S. Constitution, each of which is also REGULATED by two elements set forth in the U.S. Constitution (per Article 1 Section 8):

The power to levy INDIRECT taxes known as Excise, or Customs Taxes on INCOME from activities that are voluntarily undertaken.

These taxes must be UNIFORM for all states. (Article 1, Section 8, Clause 1)

The power to levy a DIRECT tax on the INCOME earned by property of people and their inalienable right to the enjoyment thereof.

These taxes must be APPORTIONED equally among the population

(Article 1, Section 2, Clause 3 and Art. 1, Sect. 9, cl. 4).

5. Inherent in this debate is the DEFINITION of the word INCOME, a seemingly simple task for the lay person one would think; but not so for the judiciary of the United States! Compiled in Appendix A (attached hereto) is a compendium of caselaw that patently demonstrates the wide gulf that exists on this very issue among entire circuits of the Federal Courts of Appeal!

If Justices of the Appellate Courts cannot agree on the term INCOME and the force and effect of the 16th Amendment, how does any single judge in that system expect respect from the American public and indeed the world?

6. This deplorable and embarrassing situation, that lies tucked away and mostly hidden from the American public, is EXACTLY the situation feared by George Washington himself. Just prior to the Revolution, the issuance of fiat money, and its inherent ability to corrupt clear thinking, had run amok - and old George vowed this would never happen again.

7. And yet it has. As is always the most prudent course, a historical review of the exact political situation that led up to the passage of the 16th Amendment is in order, pursuant to which it is relatively simple

to separate the wheat from the chaff. Prior to the passage of the 16th Amendment, the

political parties and their leaders were engaging in an ancient struggle:

> the shifting of the tax burden from the wealthy landed class onto the masses,

and    the masses trying their best to shift the burden back onto the wealthy landed class.

8.. The first attempt by Congress to circumvent the taxing power (AND THE REGULATION thereof ) set forth in the U.S. Constitution was the passage of the Income Tax Act of 1894 which called for a modest 2% tax on all income from real estate and personal property above $4,000.

The reaction of the Supreme Court  (Pollock) on the issue of  direct taxation on property held via Corporate privilege was uniform and decisive:

> The tax imposed by sections twenty-seven to thirty seven, inclusive, of the act of 1894,
>
> so far as it falls on the income of real estate and of personal property,
>
> being a direct tax within the meaning of the Constitution, and, therefore unconstitutional
>
> and void because, being not apportioned according to representation,  all those sections,
>
> constituting one entire scheme of taxation, are necessarily invalid.'

> Pollock v. Farmers' Loan & Trust Co., 157 U.S. 428 (1895)

6. The profound vision of the Pollock court was summarized by Justice Stephen J. Field, the senior member of the Court, in his concurring opinion:

> If the provisions of the Constitution can be set aside by an act of Congress, where is the
>
> course of usurpation to end? The present assault upon capital is but the beginning.  It will be
>
> but the stepping stone to others, larger and more sweeping, till our political contests will
>
> become a war of the poor against the rich; a war constantly growing in intensity and
>
> bitterness.'

7. How prophetic. Today America is a deeply divided nation politically and economically - exactly 50-50 on presidential voting records - with the top 1% of money earners controlling 90% of  the wealth, and 80 million recipients of government stipend are screaming "tax the rich!"

8. Conversely, for the minority, Justice John M. Harlan, in his dissenting opinion on the second case, declared that the Court by ruling against the income tax practically decides that, without an amendment of the Constitution—two-thirds of both Houses of Congress and three-fourths of the States concurring—such property and incomes can never be made to contribute to the support of the national government. But CLEARLY they are talking about INCOME and PROPERTY controlled by CORPORATE privilege (since private property was protected constitutionally by apportionment).

9. And so the grand stage was set for the 16th Amendment. While President Taft was not initially in favor of any Amendment, William Jennings Bryan began to push for an income tax on both Corporations (already existed as unapportioned Excise Taxes, which corporate income tax was the subject of the Corporate Tax of 1909 and the TARIFF Act of 1913) AND ON INDIVIDUALS. This Tuft-Bryan tussle is nothing more than the chest beatings of politicians to gain office, and, once elected, to again attempt a tax on income of individuals, by EXCISE, in those cases where the individual chose to invest in corporate activity!

10. Congressional leadership of the anti-income tax forces was assumed by Sen. David B. Hill of New York, widely regarded as the spokesman of the business and financial interests of his state. In a long and elaborate set speech before the Senate, Hill protested the policy of reducing the TARIFF and doubling the federal deficit in order "to fill the void with an income tax." Disagreeing with the president's initial recommendation for a limited tax "derived from certain CORPORATE investments," Hill affirmed: "A Federal tax upon the earnings or dividends of CORPORATIONS is no more defensible than such [a] tax upon the earnings of individuals," Under any sort of INCOME tax governmental powers would be abused by the inevitable inquisitorial features of such a law. It was undemocratic as well as unjust, and Hill charged that the income tax, far from remaining an emergency measure, would become permanent, violating the rights of the states, and moving the country another step toward socialism. If the United

States followed the course of Europe, with its heavy burdens of MILITARIES and TAXATION, Hill predicted: "It may be impracticable that our distinctively American experiment of individual freedom should go on.*

* (per THE SIXTEENTH AMENDMENT: The Historical Background Arthur A. Ekirch, Jr. in Cato Journal Vol 1 No 1 1981 p 167-8)

11. Albert B. Cummins of Iowa, representing the Progressive Republican bloc in the Senate, offered an amendment providing a tax only on individuals, in which the rates were graduated from 2 percent on incomes between $5,000 and $10,000 to 6 percent on incomes over $100,000. Since many small STOCKHOLDERS would have been penalized by the 6 percent rate paid by large corporations, Cummins stipulated an individual rather than corporate INCOME tax. Both the Bailey and Cummins amendments sought to avoid one point of conflict with the Supreme Court's Pollock decision by exempting interest from state and municipal bonds. Cummins and the Progressives believed, however, that a new set of justices might now find an income tax constitutional. In contrast, Sen. Norris Brown of Nebraska, who led a persistent fight for a constitutional amendment, explained that he distrusted the lasting quality of any Court decision on such a volatile issue as an income tax. He wanted, he declared, an amendment "which will give the court a Constitution that cannot be interpreted two ways." (from Elkrich, supra p. 172-3).

12. Clearly we can ALL see that ALL these politicians were addressing INDIVIDUAL income FROM STOCKS, BONDS AND OTHER CORPORATE activity which is a VOLUNTARY corporate activity subject to the EXCISE tax. Secondly, we can ALL see that the purposes behind the 16th Amendment was to PREVENT a future court from finding a direct income tax without regulation to be constitutional! So the issue was whether CORPORATE property, and the INCOME therefrom, would be moved into the Excise category where it MAY be taxed in the hands of an INDIVIDUAL if that person chooses to invest in a corporate activity subject to EXCISE. There is NO DISCUSSION of any DIRECT tax on an individual's private property and income therefrom protected by the apportionment regulation of the Constitution!

13. It is the poor or incomplete wording of the 16th Amendment, whether by accident or purposely ambivalent, that is creating all the division among the judges and all the confusion in the more modern "frivolous claims" court decisions, to wit:

The 16th Amendment

"The Congress shall have power to lay and collect taxes on incomes,

from whatever source derived,

without apportionment among the several states,

and without regard to any census or enumeration."

14. Any person, be they judge, lawyer or taxpayer advocate, reading this Amendment WITHOUT THOROUGHLY UNDERSTANDING the definition of the terms therein, and the political/judicial struggle behind the Amendment, could easily assume that the Amendment overturned what is arguably the most vital element (and some would say raison d'etre of the Revolutionary War) of the U.S. Constitution, that is, a REGULATED power to tax the people by insisting on representation via equal apportionment.

15. The Amendment was specifically addressed by the Supreme Court in Brushaber (1916) where various arguments were being raised to circumvent the Constitutionally mandated REGULATION of the two powers of taxation by government:

"The various propositions are so intermingled as to cause it to be difficult to classify them.

We are of opinion, however, that the confusion is not inherent, but rather arises from the conclusion that the Sixteenth Amendment provides for a hitherto unknown power of taxation – that is, a power to levy an income tax which, although direct, should not be subject to the regulation of apportionment applicable to all other direct taxes.

11

And the far-reaching effect of this ERRONEOUS assumption will be made clear by generalizing
the many contentions advanced in argument to support it.

> The Chief Justice of the Supreme Court

> Brushaber vs Union Pacific R.R. Co 240 U.S. 1 at 10-11 (1916).

16. The Chief Justice of the Supreme Court pounded away (pg 11-12) at this erroneous assumption:

"But it clearly results that the propositions and the contentions under it, if acceded to, would
cause one provision of the Constitution TO DESTROY another, that is, they would result in
bringing the provisions of the Amendment exempting a direct tax from apportionment into
irreconcilable conflict with the general requirement that all direct taxes be apportioned.

Moreover, the tax authorized by the Amendment, being direct, would not come under the rule
of uniformity applicable under the Constitution to other than direct taxes , and thus it would
come to pass, that the result of the Amendment would be to authorize a particular DIRECT
tax, not subject either to apportionment or to the rule of geographic uniformity, thus giving
power to impose a different tax in one State or States, than was levied in another State or
States. This result, instead of simplifying the situation, and making clear the limitation on the
taxing power, which obviously the Amendment must have been intended to accomplish,
would create radical and DESTRUCTIVE changes in our constitutional system AND MULTIPLY
CONFUSION."

And so the Chief Justice is repeating the sentiment supra that the purpose of the 16th Amendment
was to clearly define the limitation via regulation so that the 16th Amendment can NEVER be
construed to create a NEW tax on individual income from a source not yet being taxed (ie.direct).

If the 16th Amendment is read (erroneously) to remove all regulation on DIRECT taxing power, that Amendment destroys the foundation of the Constitution - to be free of direct taxation without a fair apportionment that is the SAME for everyone!

If an INDIVIDUAL chooses to invest in corporate stock and subject himself or herself to an Excise tax on PROFIT from that volutary endeavour, that is their choice in a free society; however this type of income tax should NEVER be confused with income FROM PROPERTY which is a DIRECT tax subject to apportionment. If the Amendment was to change the regulation of a DIRECT tax, it would have read "power to lay and collect DIRECT taxes." The Supreme Court agreed:

"The contention that the Amendment treats a tax on income as a direct tax, although it is relieved from apportionment, and is necessarily therefore, not subject to the rule of uniformity, as such rule only applies to taxes which are not direct, thus destroying the two great classifications which have been recognized and enforced from the beginning, is WHOLLY WITHOUT FOUNDATION..."

"The conclusion reached in the Pollock Case did not in any degree involve holding that income taxes generically and necessarily came within the class of direct taxes on property, but ON THE CONTRARY, recognized the fact that taxation on INCOME, was in its nature, an EXCISE, entitled to be enforced as such..."          Brushaber,supra, at page 16-18

17. Just to make sure Congress got the message, the Supreme Court in subsequent 1916 ruling stated:
"By the previous ruling, it was settled that the Sixteenth Amendment conferred no new power of taxation, but simply prohibited the previous complete and plenary power of income taxation, possessed by Congress, from the beginning, from being taken out of the category of indirect taxation, to which it inherently belonged..."

Stanton vs Baltic Mining Co. 240 US 103, at 112 (1916)

13

The 16th Amendent then is a constitutional assurance that income taxes will remain as an indirect excise tax, and can NOT be taken out of that category and applied as a direct tax! These are the only two Supreme Court decisions that squarely face the substance of the "income tax as excise" issue and have never been overturned.

This position of the Supreme Court was repeated in Eisner vs Macomber 252 U.S. 189 at 205 (1920):

"The Sixteenth Amendment must be construed in connection with the taxing clauses of the original Constitution and the effect attributed to them before the Amendment was adopted."

18. The following Supreme Court case ruled that the INCOME tax is IMPOSED on the conduct of the business of corporations organized for profit.

"As has been repeatedly remarked, the corporation tax act of 1909 was not intended to be and is not, in any proper sense, an income tax law. This court has decided in the Pollock case that the income tax of 1894 amounted in effect to a direct tax upon property, and was invalid because not apportioned according to population, as prescribed by the Constitution.

The act of 1909 avoided this difficulty by imposing not an income tax, but an excise tax upon the conduct of business in a corporate capacity. Evidently Congress adopted the income as the measure of the tax to be imposed with the respect to the doing of business in corporate form because it desired that the excise should be imposed."

Stratton's Independence v. Howbert 231 U.S. 399 (1913)

"The Sixteenth Amendment . . . does not extend the taxing power to new or excepted subjects, but merely removes all occasion, which might otherwise exist, for an apportionment among the states of taxes laid on income, whether it be derived from one source or another."

Brushaber v. Union Pacific R.R. Co 240 US 1.(1916)

14

We must reject in this case (Tariff Act of 1913), as we have rejected in cases arising under the Corporation Excise Tax Act of 1909, the broad contention submitted in behalf of the government that all receipts - everything that comes in -are income within the proper definition of the term 'gross income', and that the entire proceeds of a conversion of capital assets, in whatever form and under whatever circumstances accomplished, should be treated as gross income. Certainly the term 'income' has no broader meaning in the 1913 act than in that of 1909 (see Stratton's Independence v. Howbert 231 U.S. 399, 416) and for the present purpose we assume there is no difference in its meaning as used in the two acts.

Peck & Co. v. Lowe 247 U.S. 165, 172 (1918)

19. Moreover, an INCOME tax is applied to the PRIVILEGE of conducting business as a corporation. Accordingly, the INCOME tax is an EXCISE tax. This was confirmed by the Supreme Court in Brushaber: the conclusion reached in the Pollock case . . . recognized the fact that TAXATION ON INCOME was, in its nature, an excise, entitled to be enforced as such unless and until it was concluded that to enforce it, would amount to accomplishing the result which the requirement as to apportionment of direct taxation was adopted to prevent, in which case the duty would arise to disregard FORM and consider substance alone, and hence subject the tax to the regulation as to apportionment which otherwise as an excise tax would not apply to it."

20. Congress thereafter agreed that income taxes are limited to Excise Taxes on priviledged (corporate) taxable activity:

"The income tax is, therefore, not a tax on income as such. It is an excise tax with respect to certain activities and privileges for determining the amount of tax."

Conversely, a tax on income received from the exercise of an inalienable right, can only be taxed with a direct tax with apportionment.

"The Supreme Court, in a decision written by Chief Justice White, first noted that the Sixteenth
Amendment did not authorize any new type of tax, nor did it repeal or revoke the tax clauses
of Article I of the Constitution, quoted above. Direct taxes were, notwithstanding the advent
of the Sixteenth Amendment, still subject to the rule of apportionment and indirect taxes were
still the subject of the rule of uniformity. Rather, the Court found that the Sixteenth
Amendment sought to restrain the Court from viewing an income tax as a direct tax because
of its close effect on the underlying property."

> A Report by The Congressional Research Service. Report No. 84-168A, 784 / 725 titled
> "Some Constitutional Questions Regarding the Federal Income Tax Laws", pg 5, (5/25,
> 1979, updated 1984).

And finally this Appellate Court can also rely on Treasury Decision # 2303 (1916) which states:

"The provisions of the sixteenth amendment conferred no new power of taxation, but simply
prohibited (Congress' original power to tax incomes) from being taken out of the category
of indirect taxation (excises), to which it inherently belonged, and being placed in the
category of direct taxation subject to apportionment."

21. Again, the Supreme Court ruled that the 16th amendment did not extend the taxing power to new
non-corporate subjects, it merely made a distinction, for corporate income, that the income (profit) was
taxable, from whatever corporate source, without apportionment, which would NOW included
corporate property and corporate rents. Bowers v. Kerbaugh-Empire Co. 271 U.S. 170 (1926) was a case
concerning a corporation:

" It was not the purpose or effect of that amendment (16th) to bring any new subject within the
taxing power. Congress already had power to tax all incomes. But taxes on incomes from some
sources (corporate property) had been held to be 'direct taxes' within the meaning of the

constitutional requirement as to apportionment. The Amendment relieved from that requirement

and obliterated the distinction in that respect between taxes on income that are direct taxes and

those that are not, and so put on the same basis all income 'from whatever source derived.'

'Income' has been taken to mean the same thing as used in the Corporation Excise Tax Act of 1909,

in the Sixteenth Amendment, and in the various revenue acts subsequently passed.

In determining what constitutes income, substance rather than form is to be given controlling

weight."

The above Supreme Court case clearly states that the whole purpose of the 16th amendment was to

make income (profit), from corporate property, taxable with the corporate income tax. Change the

order of the amendment around a little and it reads:


The Congress shall have the power to lay and collect taxes

on incomes without apportionment,

from whatever source derived, among the several states,

and without regard to any census or enumeration.



Historically speaking then:

Before the 16th amendment, a corporation's property income could only be taxed with a direct

tax with apportionment.

After the 16th amendment, a corporation's property income could now be taxed with an

indirect excise tax,  as long as that property income was connected to corporate activities.

Simply put, when figuring corporate profit, it does not make any difference what the source of that

profit was. The admittedly confusing phrase  "incomes, from whatever source derived" ALWAYS

referred to corporate EXCISE taxes.

There are four Supreme Court cases, never overturned or challenged, supported by the above

Congressional affirmations, that support this premise: Income tax is levied on Excise activity.

All the cases were about corporate profits and whether corporate profits would not be taxed when

earned by individuals.


This is how the 16th Amendment could have been written to be a little more exacting:

"The Congress shall have power to lay and collect (excise) taxes on (corporate) incomes,

from whatever source derived

(even incomes from corporate property previously classifed as direct tax),

without apportionment among the several states,

and without regard to any census or enumeration."


Regardless of how Congress worded the 16th Amendment, the Supreme Court has, up to the instant

appeal, upheld the following statement:

Income received from the inalienable rights of property (rents from real estate) or (income

from labors as private endeavour) can only by taxed with a direct tax with apportionment,

according to the Constitution and the Supreme Court.

There can be no direct taxes imposed by the federal government today. The income tax is a

excise tax on corporate profit, from whatever source.


It can be well argued that the very purpose of the 16th Amendment was to provide a very limited

income tax on an individual 's corporate profits BUT NO MORE (ala Neville Chamberlains's infamous

"this much and no more"). All thought at the time of the passage of this Amendment involved

income on corporate activity. Income on private property was sacrosanct under the Constitution.

18

18.    How the IRS and even some judges become confused lies in their failure to distunguish the basis of
the INCOME under scrutiny:

>    If it is income from a privilege, it is subject to an EXCISE tax;   and

>    If it is income from property (real or personal) it is subject only to a direct tax that must
>    be apportioned.

Perhaps this example will clarify this whole sordid mess:

>    If you contract to offer your property (labor) to a corporation and they trade $50 of corporate
>    property, the IRS says you had a taxable profit.

>    But looking in the mirror, the corporation has traded $50 of corporate property for $50 of your
>    property (labor), the IRS allows a deduction  and therefore there is no taxable profit in the hands
>    of the corporation.

>    How does the IRS justify the profit in your hands?

More importantly, we begin to "see" that the result today of the above example is that corporations
end up with all the money and little taxable income,  while the people's money is taken to pay the vas
majority of the interest on the national debt. The balance of the money they pay to the federal
government goes to a massive military, with very little left for education. That expense is generally paid
by more taxes on property. To use a POLITICAL system to resolve the dilemma is now impossible, as the
nation is today split 50-50 politically, and 90% of the wealth, corporately held,  is controlled by the top
1% which has managed to shift the tax burden onto the people, who today owe almost $20 Trillion to
foreign interests, or $70,000 for every man, woman and child.

19

The enterprise, that was creating jobs to help repay the foreign debt before it was subjected to the income tax now under appeal, has collapsed due to recession and excessive taxation. This is exactly the result when the REGULATOR on the power of the government to tax the people is artificially and unconstitutionally removed, as foreseen by the Supreme Court back in 1916. It is highly doubtful the corporations will be applying to the Supreme Court to overturn a victory they have won by sloughing the tax burden onto the masses.

It is now up to one person, standing before an Appellate Court that has courage to examine their own conscience, along with the history of the Supreme Court supra, and to begin to protect the American people from influences foreign to their freedom.

## CONCLUSION OF ISSUE #1

The activity in the case on Appeal was income received from the pursuit of an inalienable right (private construction and book publication) and was NOT income derived from the privilege of corporate GAIN derived from capital or labor (wages) that is subject to an EXCISE tax.
There is obiter in the Brushaber case that may lead one to conclude that the IRS can impose a tax on income and thereby presume an Excise Tax that requires rebuttal. If so, the Appellant asserts his income was NOT derived from any activity of a corporate nature. The burden should now shift to the Appellee to demonstrate the Excise activity the Appellant performed which would become the basis for any taxation.*

* Note: IRC defines income as "taxable earned income" without delineating the substance taxed –
        Corporate Privilege or private property.

If the Appellee Commissioner cannot so demonstrate the activity subject to Excise tax, this Appeal Court must overturn the lower court decision with costs, including time spent away from earning, to the Appellant.

APPENDIX

(credit: Larry Brecraft, attorney, http://www.constitution.org/uslaw/uncertain.htm)


### FEDERAL CIRCUITS SPLIT ON 16TH AMENDMENT

First Circuit:

It is difficult to determine the meaning of the 16th Amendment because in United States v. Turano, 802 F.2d 10, 12 (1st Cir. 1986), that court held that the "16th Amendment eliminated the indirect/direct distinction as applied to taxes on income." Next door in the Second Circuit, there is uncertainty revealed by three completely inconsistent cases. In Jandorf's Estate v. Commissioner, 171 F.2d 464, 465 (2nd Cir. 1948), that court declared,

> "It should be noted that estate or inheritance taxes are excises ... while surtaxes, excess profits and war-profits taxes are direct property taxes."

Surtaxes are the graduated taxes of the income tax, so this court holds that the personal income tax is a direct tax. But in Ficalora v. Commissioner, 751 F.2d 85, 87 (2nd Cir. 1984), that court stated that the personal income tax was an indirect tax:

> "[T]he Supreme Court explicitly stated that taxes on income from one's employment are not taxes and are not subject to the necessity of apportionment."

But compare United States v. Sitka, 845 F.2d 43, 46 (2nd Cir. 1988) (citing Parker, infra, for the proposition that the tax is direct).


Third Circuit:

It has been held in one case that all income taxes are direct, but in another that only some are direct; see Keasbey & Mattison Co. v. Rothensies, 133 F.2d 894, 897 (3rd Cir. 1943) ("[A]n income tax is a direct tax upon income therein defined"); and Penn Mutual Indemnity Co. v. Commissioner, 277 F.2d 16, 19

(3rd Cir. 1960) ("Pollock .... only held that a tax on the income derived from real or personal property was so close to a tax on that property that it could not be imposed without apportionment. (The Sixteenth Amendment removed that barrier").

Fourth and Sixth Circuits:

The income tax has been held to be an excise tax; see White Packing Co. v. Robertson, 89 F.2d 775, 779 (4th Cir. 1937) ("The tax is, of course, an excise tax, as are all taxes on income..."); and United States v. Gaumer, 972 F.2d 723, 725 (6th Cir. 1992) ("Brushaber and the Congressional Record excerpt do indeed state that for constitutional purposes, the income tax is an excise tax").

Fifth, Seventh, Eighth and Tenth Circuits:

Arguments that this tax is an excise have been squarely rejected and determined to be frivolous.

For example, in Parker v. Commissioner, 724 F.2d 469, 471 (5th Cir. 1984), the court clearly rejected the contention that this tax is an excise:

> "The Supreme Court promptly determined in Brushaber... that the sixteenth amendment provided the needed constitutional basis for the imposition of a direct non-apportioned income tax.
>
> "The sixteenth amendment merely eliminates the requirement that the direct income tax be apportioned among the states.
>
> "The sixteenth amendment was enacted for the express purpose of providing for a direct income tax."

In Coleman v. Commissioner, 791 F.2d 68, 70 (7th Cir. 1986), the court held that an argument that this tax was an excise was frivolous on its face ("The power thus long predates the Sixteenth Amendment, which did no more than remove the apportionment requirement...").

22

A similar conclusion was reached in United States v. Francisco, 614 F.2d 617, 619 (8th Cir. 1980),

that court declaring that Brushaber held this tax to be a direct one:

"The cases cited by Francisco clearly establish that the income tax is a direct tax, thus refuting the

argument based upon his first theory.

See Brushaber v. Union Pacific Railroad Co., 240 U.S. 1, 19, 36 S.Ct. 236, 242, 60 L.Ed. 493 (1916) (the purpose of the Sixteenth Amendment was to take the income tax 'out of the class of excises, duties and imposts and place it in the class of direct taxes')".


In Stelly v. Commissioner, 761 F.2d 1113, 1115 (5th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 149, 88

L.Ed.2d 123 (1985) (citing numerous cases holding taxation on income constitutional). The Tax Court's

determination that the amount received by appellant from his employers constituted taxable

income was correct. This is again a case, like many others, where the Appellant's argue not GAIN since

they traded labor for wages. (The correct analysis is income from what activity, corporate/privileged or

private protected by constitution.)


In United States v. Lawson, 670 F.2d 923, 927 (10th Cir. 1982), that court expressed in the following

fashion its contempt for the contention that the federal income tax was an excise:

> "Lawson's 'jurisdictional' claim, more accurately a constitutional claim, is based on an
> argument that the Sixteenth Amendment only authorizes excise-type taxes on income
> derived from activities that are government-licensed or otherwise specially protected...
> The contention is totally without merit... The Sixteenth Amendment removed any need
> to apportion income taxes among the states that otherwise would have been required
> by Article I, Section 9, clause 4."

In Stelly v. Commissioner, 761 F.2d 1113, 1115 (5th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 149, 88

L.Ed.2d 123 (1985) (citing numerous cases holding taxation on income constitutional). The Tax Court's

determination that the amount received by appellant from his employers constituted taxable income

was correct. This is again a case, like many others, where the Appellant's argue no GAIN since they traded labor for wages.

Here we CLEARLY see that the Appellant had wrongly framed the question when he asserted a trade of labor for money as non taxable. Then the Court reached for the Income Tax Act's section delineating his private property income as taxable WITHOUT EXAMINING THE CONSTITUTION which ALL issues involved (because Appellant did not raise it!). The Income Tax section stated "gross income means all income from whatever source derived" is constitutional under the 16th Amendment IF the basis of the income was CORPORATE activity, but unconstitutional if the income was earned from a non corporate endeavour. This is the HOLDING by the Supreme Court in Brushaber - and the Appelate Courts ought to know this!

## CONCLUSION

Alarmingly, while the Supreme Court rejected in Baltic the argument that "the 16th Amendment authorized only an exceptional direct income tax without apportionment," this position now prevails in the Fifth, Seventh, Eighth and Tenth Circuits. In the Second Circuit, the existing authority illogically claims that the tax is both. A direct tax applies to and taxes property while an indirect, excise tax is never imposed on property but usually an event such as sales; see Bromley v. McCaughn, 280 U.S. 124, 50 S.Ct. 46, 47 (1929). 4 Those courts which hold that an income tax is a direct property tax believe that income is property, yet those which hold that this tax is an excise declare that income is not property.

If the courts of this nation cannot identify what is the nature of this ephemeral item known as income, then how can the American people?

ISSUE #2

WAS THE DEFICIENCY NOTICE ITSELF ISSUED ON AN ERROR OF LAW?

1. The Trial Court erred in stating at p 8:

Generally the Commissioner's determination of a deficiency is presumed correct,

and the taxpayer (TP) has the burden of proving it incorrect.

Welch v Helvering 290 US 111, 115 (1933)


A more careful reading of the Supreme Court's decision in United States v. Rindskopf, 105 U. S. 418;
Fidelity & Columbia Trust Co. v. Lucas, 7 F.2d 146, cited in the Welch decision, easily establishes that
the Supreme Court grants this presumption of correctness when the Commissioner is gathering
evidence to support A CORRECT STATEMENT OF THE TAX LAW AND REGULATIONS.


Conversely, when the Commissioner issues a Deficiency Notice based on an INCORRECT STATEMENT
of the law, the Deficiency should be struck down and the ruling at trial OVERTURNED with costs to
the Appellant.


2. In the Appellant's case, the Commissioner in his initial Trial Brief attempted to state the LAW
regarding deductions of mileage driven from a TP's home to his place of business:

" It is well settled that, as a general rule, the expenses of traveling between one's home and his
place of business or employment constitute commuting expenses, which are non deductible,
personal expenses."

Fausner v Commissioner, 413 US 838 (1973)

Commissioner v Flowers 326 US 465 (1946)

25

Feistman v Commissioner, 63 T.C. 129, 134 (1974)

"This rule applies whether the taxpayer travels between his residence and one fixed jobsite

or between his residence and any one of a number of different jobsites within the metropolitan

area. "

Steinhort v. Commissioner  335 F 2d 496

3. This statement is NOT correct. In January of 1999, the Commissioner issued Revenue Rule 99-7,

drafted by Edwin B. Cleverdon of the Office of Assistant Chief Counsel (Income Tax and Accounting)

pertaining to Section 162.--Trade or Business Expense 26 CFR 1.162-2:

Traveling expenses (Also §§ 262; 1.262-1.) :

Transportation expenses CAN be deducted if they are for:

(1) travel between the TP's home and a temporary work location
OUTSIDE the TP's metropolitan area;

(2) travel between the TP's home and a temporary work location
(in the same business) regardless of the distance travelled,
provided the TP has one or more regular work locations away from
home;

(3) travel from the home where that home is TP's regular place of
business.

If the tax system is to be fair, and there is a presumption in favor of the Commissioner, that

presumption exists due to the fact that the Commissioner hires professional lawyers at the TP's expense

to state and administer the law correctly. The presumption then covers only the finding of evidence.

Once the Commissioner proceeds on a faulty premise of law, the entire proceeding is highly prejudicial

to the TP for the following reasons:

1) The high cost of a trial attorney often exceeds the deficiency; The TP appears then without counsel.

2) The complex nature of deductions for mileage from home is so convoluted that the TP, with or without the burden, with a CPA, and with or without counsel, can hardly make any sense of the law even though, as in this case, the TP hired a professional CPA/Professor of Taxation (see Trial Ex. 15-J ) who could not, along with the Commissioner's lawyers, accurately state the law.

4. Allow me to explain the complexity of this deduction:

1) The Caselaw supporting the Commissioner's erroneous statement and cited by the Trial Judge deals with TP's driving automobiles to various work locations. They do NOT deal with contractors who must go to supply houses to purchase materials ON A REGULAR BASIS.

2) The Trial Court stated that the general rule prohibiting the deduction of miles from one's residence is rooted in case law. That case law generally lumped Employees and Self Employed TP's into one group forcing the SE TP's who have multiple work locations and are therefore required to keep complicated logs, and fashion home office arguments, and numerous other restrictions to deduct mileage from home.

Eventually the Commissioner began to recognize the plight of the SE TP's who have multiple work locations by issuing Rev. Rule 90-23 which stated (in part):

> "for a taxpayer who has one or more regular places of business, daily transportation expenses paid or incurred in going between the taxpayer's residence and temporary work locations are deductible business expenses under § 162(a), regardless of the distance."

Wonderful rule except that the Commissioner neglected to expressly exclude the TP's residence as one

of those regular places of business.  So along came Charles Walker in <u>Walker v Commissioner</u> 101 T.C

~~537, 546 (1993) who was a logger driving up to 60  miles to get to the forest  but, on a regular basis,~~

performed the following tasks at his residence:

> Petitioner worked at his residence for approximately 7 hours each week (and in forest the rest
> of the time);
>
> He contacted or was contacted by his employer to determine where he was to be the next day.
>
> He repaired, maintained,  and stored his tools and equipment at his workshop.


That Trial Court held that the petitioner WORKED at his residence <u>on a regular basis</u> within the
meaning of the ruling, even though Mr. Walker was doing work-related tasks other than the
cutting down of trees.


Here we can all see the Commissioner unable to enforce its OWN ruling. Upset, the Commissioner
at first just ignored the holding, then issued  Rev. Rule 90-47 which expressly removed the
residence as a regular place of business. The TP would have to have one or more regular places
of business away from one's residence.


5.   Looking at the "Caselaw" cited by the Trial Judge and the initial Revenue Rulings 90-23 and 90-47,
how is an independent business person supposed to understand ANY of these situations in order to
decide whether he can take advantage of ANY of the situations provided, especially when the
Commissioner cannot even follow his own rules?

6.   Eventually Rev-Rule 99-7 was formulated to summarize or further refine rules for deductibility of
miles driven from home. That Rule should have been the very focus of the Commissioner's Deficiency

inquiry so the TP can properly prepare his case, especially since he would bear the burden of proof

initially. The failure of the Commissioner to so cite Rev Rule 99-7 so severely hampered the TP that no

fair trial could take place. Both the Commissioner and the Petitioner/Taxpayer spent their efforts

examining the mileage between jobsite and supply houses, and not mileage from home to jobsite when

another "regular work location" was involved.

7.    When a TP is deducting mileage from home, the correct analysis is:

Was the jobsite temporary?

Is there another "regular work location?

This inquiry never took place prior to the Briefing stage. The Commissioner misled the Appellant.


ISSUE #3

DID THE TRIAL JUDGE ERR IN HIS INTERPRETATION OF REV. RULE 99-7?

8. It gets worse. While the Rev Rule 99-7 is more clear than the caselaw, it does not provide any

definitions for its key phrases.

EXAMPLE #1  Rev Rule 99-7 (1) prescribes a boundary of the TP's Metropolitan area but gives no

distances. The TP who is a contractor takes a job 10, 20, 30, 40 miles from his home

and has NO IDEA whether the miles can be deducted.

The Trial Court then had to INFER a definition of Metropolitan area AFTER the trial is

over and after the miles have been driven, and after the job has been completed.

How does any TP know whether to take the job at a certain price when he cannot

calculate the mileage deduction into his decision to accept the job?


EXAMPLE #2  Watch carefully the mental gymnastics the Trial Court had to do when there was no

definitions for 2 key phrases in Rev Rule 99-7:

When Rev Rule 90-47 was enshrined in Rev Rule 99-7(2), the term "one or more regular places of business" was amended to "one or more regular work locations," but gave no definition of the new term.

The Trial Court at page 30 had to INFER these two terms meant the SAME thing, the latter "regular work locations" being derived from the even earlier Rev Rule 90-23, that was supposedly rendered obsolete!

The new definition is the old definition:

"any location at which the TP performs work or services on a regular basis."

QUESTION: Why then change the term if it means the SAME thing?

The Trial Court then went on to assert that "regular work location" and "temporary work location" mean the OPPOSITE thing.

Why did "regular place of business" and "regular work location" mean the SAME thing, but these two terms are mutually exclusive?

The Court erred in that the opposite of 'temporary' is permanent. If the business location becomes permanent (after one year), then the TP is deemed to be commuting to a permanent location and could then make a personal choice to move closer to reduce his commute.

Conversely, the opposite of 'regular' is infrequent, unscheduled, random, part time, abnormal.

A General Contractor regularly drives all over the Metropolitan area to the same work

locations, that are all temporary (supply houses, banks, jobsites). It is the fact that he is
doing so ON A REGULAR BASIS that constitutes one half of the equation.

9. The key issue before the Appellate Court is "Where does all this "INFERRING" of terms leave the poor
Contractor?" The Appellate Court should reverse ALL the convoluted thinking between the IRC with
complete lack of definitions, and the vaunted Caselaw which fails to distinguish between

Employees who can choose their car or a bus or a train to COMMUTE, and an independent
contractor who has to drive all over town, with his complex logs, to perform his business, and form
one SIMPLE RULE for independent contractors who CANNOT commute on a bus or train with
his 2x4's and a massive number of tools to install them!!!!

### PROPOSED:   NEW RULE FOR CONTRACTORS

The TP, who has one or more temporary work locations, away from the home,
may deduct the miles driven from home to that temporary work location.
PROVIDED HE IS RESPONSIBLE FOR PURCHASING MATERIALS, ON A REGULAR BASIS
FOR THAT BUSINESS.

This does away with Metropolitan areas, complicated mileage logs. Contractors need only establish
which jobsite for how long.
Contractors who are responsible for buying materials on a regular basis may deduct miles from
home.
Conversely, Contractors who simply drive to construction sites to work as employees are merely
commuting.

ISSUE #4

DID THE TRIAL COURT ERR IN NOT PROPERLY CONSIDERING EXHIBIT #17-J and 18-J IN DETERMINING

APPELLANT DID NOT PROVE A "REGULAR WORK LOCATION."

10. First let's see how the government's lawyers fared in presenting a biased case to the Trial Court. The

Commissioner's lawyers regrouped in their Trial Reply Brief where they gave the history behind 99-7 (2)

then asserted the Petitioner (Appellant) did not show that he had one or more 'regular work locations'

away from the home." (ENTIRE RECORD).


Shockingly, the IRS lawyers do not cite Exhibit 17-J and 18-J at all; rather they refer only to Ex. 23-P

and 24-P where they were still alleging that the Appellant did not prove the date, miles driven or

business purpose of those trips, not realizing that Rev Rule 99-7 only requires the Appellant to prove

"another regular work location" in order to deduct mileage from home to a temporary jobsite. This

proves that at no time prior to the Reply Brief was the IRS lawyers or field representatives even aware

of their own rules!

11. Then they argued that TP did not prove he went to a supply house as "another regular work

location" when the PROOF was sitting right in Ex. 17-J and 18-J that the IRS accepted to lower

Appellant's 1099 amounts!

12. Again, the insistence by the IRS lawyers that TP prove his mileage from the work place to a supply

house and back, and their complete neglect to cite Exhibit 17-J and 18-J's compliance with Rev Rule 99-

7 was highly prejudicial to the TP, especially where the evidence is presented first and the Briefs are

considered second. The IRS should be required to present the TP with the correct statute and caselaw

underlying their presumed correctness. Then we would have a fair game!

13. Second, how did the Trial Judge fare? After ruling that the jobsites were "temporary work

locations", he ruled at p. 32 "the Petitioner has not shown that he had other, regular work locations."

The Trial Court completely overlooked Exhibit 17-J (2005) and 18-J (2006) which each stated that "on a regular basis, the Petitioner presented receipts for materials purchased at supply houses."

The Trial Court stated no reasons other than a mere footnote #10:

" We reject petitioner's contention that his storage shed, his car, the bank and various building supply locations should be considered regular work locations. Petitioner has not established that he (worked) or (performed) services on a regular basis at any of these locations.

14. The Appellant had presented:

(1) two different debit card accounts used at supply houses, one for his home and the other for his business (which were the receipts presented in 17-J and 18-J);

(2) bank statements showing various expenses at supply houses from his one business account:

(3) bank statements demonstrating that "on a regular basis" the Appellant had to go to his bank to replenish his account to make more purchases for his business.

15. The Appellant stated at Transcript page 10 that he was to (invest) $28,000 "to purchase a new construction vehicle for our use to run the enterprise," and not for commuting.

16. Is the Appellant not "working" when he is at the Home Depot, or the bank? What else is he DOING there? He presented receipts ON A REGULAR BASIS from SOMEWHERE! If any TP bought something there, and drove to the temporary jobsite, those miles are deductible BECAUSE he was working.

17. Why does the conduct of Walker at his home constitute "a regular place of business" (Walker was not cutting trees in his home office) but not the Appellant's purchases at supply houses as proven by Ex. 17-J and 18-J.

18.  If receipts from payors, and bank statements are not sufficient evidence, what else could the Appellant have provided? Even if he had kept copies of each receipt over the two year period, the Commissioner would repeat his argument in his Reply Brief that TP could have had the materials delivered, or the Trial Court could repeat its statement that the materials could have been for Appellant's home. Both entities miss the point that materials were purchased somewhere and got to the jobsite in Appellant's truck he said he bought for that purpose. Once Appellant proves he bought materials "on a regular basis" from a supply house, then that supply house is "another regular work location," as is the bank.

19.  It is significant to the bias of the Trial Court that it never mentioned that the Appellant's payor was a professional electrician who would have to rely  on the Appellant's knowledge of materials required as an explanation of WHY Appellant HAD to go to supply houses. Between the payor and  the Appellant, only the Appellant had the requisite experience to select materials.

20.  Moreover, the Trial Court remained vigilant in its clinging to the "no miles from home" rule and seemed to insist that the TP had to be hammering  nails at the Home Depot or the Bank, when clearly the Commissioner lessened the phrase "regular place of business" to the far broader term  "regular work location." A contractor IS working when he is at Home Depot. Period.

21.  The mileage driven is not in question as each weeks job location is in the logs and the google maps indicating the distance driven was provided by the Commissioner and it matched perfectly the logs provided by the Appellant.

ISSUE #5

DID THE TRIAL COURT ERR IN NOT ALLOWING THE APPELLANT DEDUCTIONS FOR RESEARCH
BOOKS USED IN CREATING HIS BOOK SERIES?


22.   The Trial Court somehow determined that the books presented by Appellant were popular books
one might read for pleasure. What does that have to do with anything? Hopefully, the Appellant IS
researching topics of popular pleasure so that he can make a sale or two.

Secondly, the Appellant stated that he had to first read a broad volume of books to determine IF there
was a controversy or gap in the "popular" subject matter that would warrant a new book series. If the
Appellant found none after four years of reading but took the deduction in the years of purchase, the
IRS would disallow the deduction as there was ultimately no book series.


23.   The Trial Court actually cited A. Finfenberg v Commissioner 17 T.C. 973, 982-983 (1951) to justify
its decision:


   "Expenses incurred and paid for in prior years are not deudctible in later years though
   INCIDENTAL to earnings in later years."


24.   The Trial Court erred in two ways:

   1) The books deducted by the Appellant are NOT incidental. Appellant is an historian writing about
      Weight Loss and Disease Reversal and The Origins of Mankind from an historical perspective
      and accordingly the books he purchased form the cornerstone of his book series.
      The assertions in his book series cannot come from his own experience.


   2) The caselaw cited by the Appellant carefully protects even budding authors from any "chilling

effect" on their research. In this regard, the Trial Court's assertion of "incidental" is certainly

chilling.                              E.Snyder v United State

There is no requirement the author produce a book; only that he spend a considerable time

writing.                              Gestrich v Commissioner, 74 T.C. 525 (1980)

25.  The Trial Court's bias against the Appellant can clearly be seen when it stated at p 43: "It is unclear

whether, at the time petitioner make the purchases, he intended to write in the future." At Transcript

page, 53 in his direct testimony the Appellant stated "I 've testified today that I spent time researching a

book series up to '05 and '06." Then later "I took that (job) in order to have the time to write the series."

So the research went  first, and the job that produced the taxable income came second. The Appellant

even produced the research books along with a commission check for his work.


## ISSUE #6

### DID THE TRIAL COURT ERR IN NOT ALLOWING A DEDUCTION FOR A CELL PHONE?

26.  In a self employed construction industry, the Court could almost take Judicial Notice of the fact that
a cell phone is a integral part of daily affairs

in communicating with other business relationships.

The restriction cited by the court in S 280F(d)(4) ought to be limited to Employees who are
deducting cell phone usage since that is not in the

ordinary course of their employment for 8 hours a day in a permanent place of business where
there are landlines available.

**CERTIFICATE OF SERVICE**

JAN 3 1 2013

I, Glenn Bogue, Pro Se hereby certify that on Monday Jan. 28, 2013 I caused to be served

upon counsel of record  for Appellee one paper copy of the Brief for Appellant via 2 day mail

to the address below.

DEPT OF JUSTICE

TAX DIVISION

Box 502

Washington DC 20044    Attn Carol Barthel

Glenn Bogue  Pro Se